# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00255-CR

**Christopher Ryan Robinson, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. D-1-DC-09-500054, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING**

---

## O P I N I O N

A jury found Appellant Christopher Ryan Robinson guilty of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A) (West 2011). The trial court sentenced Robinson to life imprisonment. On appeal, Robinson claims that (1) the evidence was legally insufficient to support the finding that he was the primary actor in these murders; (2) the trial court erred in denying his motion to suppress evidence obtained pursuant to search warrants for his home, SUV, and blood; (3) the court erred in denying his motion to exclude various expert testimony; and (4) the court erred in denying his motion to exclude testimony based on the witness's competency. We affirm the conviction.

### BACKGROUND

On January 8, 2009, Jesus Nieto and Mikayas "Mickey" Mekonen were packaging marijuana in the living room of Nieto's home in Austin.[1] Nieto's wife, who was in the bedroom, heard

---

[1] Unless otherwise indicated, the facts recited herein are taken from the testimony and exhibits admitted at trial.

gunshots and hid in the closet with her son. When she eventually entered the living room, she found Nieto and Mekonen on the floor. Both Nieto and Mekonen had been shot several times. Nieto's wife called 911, and Travis County Sheriff's deputies arrived on the scene within minutes. Nieto died at the scene and Mekonen was pronounced dead at the hospital.

*Investigation*

Investigators with the Travis County Sheriff's Office arrived shortly after the scene was secured by the responding deputies. They collected the victims' cell phones, along with bullets, samples of the victims' blood, and what remained of the packaged marijuana. During this initial investigation, Nieto's neighbor told investigators that she saw a small, black SUV parked in front of Nieto's home near the time of the shooting. The lead investigator's initial impression was that the shooting was a drug deal "that had gone bad."

Subsequent investigation of the victims' cell phones revealed that, on the morning of the shooting, Mekonen had received four calls from a Waco-area phone number. After subpoenaing records for the Waco-area phone number, investigators identified the number as Robinson's cell phone. Investigators were also able to use the phone records to track Robinson's location on the day of the shooting. This tracking revealed that he drove from Waco to Austin on the morning of the shooting, was in the vicinity of the crime scene within hours of the shooting, and drove back to Waco after the shooting.

Investigators contacted Waco-area police officers, at which point they learned that Robinson was living with his girlfriend in Waco and that his girlfriend owned a black Mercedes SUV. They also learned that during a previous interaction between Robinson and Waco police officers,

2

Robinson admitted to keeping a .38 caliber revolver in his home, the same caliber as the bullets recovered from the crime scene. Based on this information, investigators obtained search warrants for Robinson's home and SUV.

On February 3, 2009, sheriff's officers executed the search warrants for the SUV and home. Officers stopped Robinson's girlfriend while she was driving the SUV and seized the vehicle pursuant to the warrant. While officers detained Robinson's girlfriend at the police station, a SWAT team surrounded Robinson's home. After confirming with Robinson's girlfriend that Robinson was home, an investigator called Robinson from the girlfriend's cell phone. When Robinson answered, the investigator told him that police had surrounded his home and that he needed to come outside. Robinson initially did not leave the house; first he claimed that he was not home, then he attempted to leave out of the back screen door, and ultimately he started his car and tried to open the garage door. The SWAT team prevented these attempts, and Robinson eventually surrendered and exited the front door.

Investigators entered the house pursuant to the search warrant. They found a burning bag on the back porch, which they quickly extinguished. Investigators recovered several items of clothing and a .38 caliber revolver from the bag. They also seized plastic wrappers, packaging, and duct tape that was similar to the packaging of the marijuana at the crime scene. Robinson was taken into custody, and a warrant was issued for his arrest the following day. Investigators also obtained and executed a warrant for samples of Robinson's DNA. Robinson was indicted for capital murder on May 7, 2009.

3

*Trial*

Robinson's trial began on April 12, 2010, and lasted six days. At trial, the lead investigator testified about the course of his investigation as outlined above. Prior to his testimony concerning the search of Robinson's home and SUV, the court held a hearing outside the presence of the jury on Robinson's motion to suppress evidence obtained pursuant to the search warrants. At this hearing, Robinson argued that the search warrants were not supported by probable cause, and thus the evidence obtained pursuant to the search warrants must be excluded at trial. The trial court overruled Robinson's motion, and the investigator concluded his testimony.

The State also called Cierra Williams, Nieto's neighbor, as a fact witness. Williams testified that she saw a black SUV outside the crime scene on the day of the shooting. She also identified a picture of a Mercedes SUV that she claimed was the same model as the SUV outside Nieto's home.[2] After cross-examination, Robinson objected to Williams's competency to testify and moved to strike her testimony. The trial court overruled the objection.

The State called several experts to testify about the forensic evidence recovered in the course of the investigation. One expert for the State testified that his examination of Robinson's SUV revealed gunshot residue and the presumptive presence of blood in the passenger seat and along the inside of the passenger door, though this blood was never tested against any of the DNA samples in this case. A ballistics expert testified that the revolver recovered from Robinson's home was the firearm used to shoot Nieto and Mekonen. Two other experts for the State testified that the clothing

---

[2] Investigators confirmed that the picture that Williams identified was the same model as Robinson's SUV.

4

recovered from the burning bag had traces of gunshot residue as well as Nieto's and Robinson's DNA.[3] Robinson's girlfriend identified some of the recovered clothing as Robinson's and testified that the rest was the same brand that he usually wore.

Sheriff's Deputy Ben Wright testified for the State about the method that he used to track Robinson's cell phone activity on the day of the shooting. During direct examination, Robinson objected to Deputy Wright's qualifications as an expert; the trial court overruled this objection. Deputy Wright explained that Robinson's phone activity showed that, on the morning of the shooting, Robinson called Mekonen four times while driving from Waco to Austin. Deputy Wright further stated that Robinson arrived near the vicinity of Nieto's home prior to the murders and remained in the area of the crime scene until after the shooting. Finally, Deputy Wright stated that Robinson's phone calls showed him leaving Austin after the shooting and never calling Mekonen again.

The State also called Melissa Valdez, a trace evidence analyst with the Department of Public Safety. Prior to her testimony, Robinson objected to the reliability of Valdez's testing as well as the relevancy of her testimony. The trial court overruled these objections and allowed Valdez's expert testimony. Valdez then testified about the tan, brown, and teal duct tape recovered from both the crime scene and Robinson's home. She stated that, based on a side-by-side visual comparison, the tapes were similar in color, width, thread count, and adhesive backing such that they "could share a common source." However, Valdez admitted that she could not say that it was "more likely than

---

[3] Only some of the DNA samples could positively be identified as Nieto's, while others matched Nieto to the extent that the odds of matching another Latin-American were one in 889.7 trillion. Similarly, other samples matched Robinson only to the extent that the odds of matching another African-American were one in 11.05 billion.

not" that the tapes were from the same source unless the torn ends of the tapes could be pieced back together.

Throughout the State's case, Robinson alluded to the possibility that Ernest Blanco was the actual shooter in these murders.[4] Investigators testified that they contacted Blanco, who voluntarily cooperated with the investigation and provided a DNA sample. Investigators further stated that Blanco's DNA did not match any of the DNA recovered in this case, and thus they excluded Blanco as a suspect. The State called Blanco as a witness, who testified that he was in Waco visiting his newborn son on the day of the murder. Blanco further stated that he had not been to Austin in several months. Blanco's alibi and credibility were thoroughly scrutinized by Robinson during cross-examination. At the conclusion of the State's case-in-chief, Robinson recalled the lead investigator and questioned him about his investigation of Blanco as a suspect. Robinson did not call any other witnesses and did not testify. After the close of evidence, the jury found Robinson guilty of capital murder. The State did not seek the death penalty, and the trial court sentenced Robinson to life imprisonment. This appeal followed.

## DISCUSSION

Robinson effectively raises four issues on appeal.[5] First, he contends that the evidence was insufficient to support the jury's finding that he was the primary actor in these murders. Second,

---

[4] During interrogation, Robinson told investigators that Blanco shot Nieto and Mekonen and then forced Robinson to keep the gun and other evidence under threat of violence. While Robinson's statements during his interrogation were not admitted at trial, Robinson's accusation that Blanco was the shooter was admitted to explain the subsequent investigation of Blanco as a potential suspect.

[5] Robinson raises these issues in nine separate points of error. However, for convenience, we have grouped the points of error into four legal issues.

6

he claims that the trial court erred in denying his motion to suppress evidence obtained pursuant to search warrants because the warrants were not supported by probable cause. Third, Robinson argues that the trial court erred in admitting the expert testimony of Deputy Wright and Valdez. Finally, Robinson challenges the trial court's finding that Williams was competent to testify.

## Sufficiency of the evidence

In his first point of error, Robinson claims that the evidence produced at trial is legally insufficient to sustain his conviction. The trial court denied the State's request to instruct the jury on the law of parties. *See* Tex. Penal Code Ann. § 7.02(b) (West 2011) (statutory authority to hold conspirators guilty of felonies committed by co-conspirators). Therefore, Robinson could only be convicted of capital murder if the jury found that he shot Nieto and Mekonen in the same criminal transaction. *See id.* § 19.03(a)(7)(A); *see also Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996) ("Where there is no charge on the law of parties a defendant may only be convicted on the basis of his own conduct.").

### Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In making this determination, we consider all evidence that the trier of fact was permitted to consider, regardless of whether it was rightly or wrongly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Allen v. State*, 249 S.W.3d 680, 688-89 (Tex. App.—Austin 2008, no pet.).

We view this evidence in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Therefore, we presume that the factfinder resolved any conflicting inferences and issues of credibility in favor of the judgment. *Id.*

*Analysis*

A person commits the offense of capital murder if he murders more than one person during the same criminal transaction. Tex. Penal Code Ann. § 19.03(a)(7)(A). Murders are committed in the same criminal transaction if they occur over a "'continuous and uninterrupted chain of conduct occurring over a very short period of time . . . in a rapid sequence of events.'" *Jackson v. State*, 17 S.W.3d 664, 669 (Tex. Crim. App. 2000) (quoting *Rios v. State*, 846 S.W.2d 310, 311-12 (Tex. Crim. App. 1992)). Circumstantial evidence can be as probative as direct evidence, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to the guilt of appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* at 13 (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

At trial, the State presented evidence that (1) Robinson was in possession of the murder weapon, (2) his clothes contained gunshot residue as well as his and Nieto's DNA, (3) Robinson attempted to destroy this physical evidence and flee when investigators came to search his home, (4) Robinson called Mekonen four times while driving from Waco to Austin on the morning of the shooting, (5) Robinson was in the vicinity of Nieto's home for the few hours leading up to the murders, (6) Robinson's SUV matches the description of a vehicle at the crime scene, and

(7) Robinson's SUV tested positive for gunshot residue and the presumptive presence of blood. From this evidence, the jury could reasonably have inferred that Robinson drove in his SUV from Waco to meet Nieto and Mekonen, shot them both, and then attempted to destroy the evidence of his crime when he learned that investigators were closing in. *See Jackson*, 17 S.W.3d at 668-69 (holding defendant's bloody fingerprint and DNA at crime scene was sufficient to establish guilt). Furthermore, the jury could reasonably have believed that Blanco was not involved in these murders given his cooperation with investigators and his testimony that he did not know the victims and had not been in Austin for several months. *See Clayton*, 235 S.W.3d at 778 (noting that when record supports conflicting inferences, reviewing court presumes factfinder resolved conflicts in favor of verdict).

Robinson argues that the jury's finding of guilt was based on the impermissible stacking of inferences. Specifically, Robinson claims that the jury could only have concluded that he was the primary actor based on inference stacking because no single piece of evidence proves that he was the shooter. In support of this argument, Robinson relies on *Pesina v. State*, 949 S.W.2d 374, 382-83 (Tex. App.—San Antonio 1997, no pet.). In *Pesina*, the victim's body, blood, and the murder weapon were found at the defendant's home. *Id.* at 378-80. However, evidence showed that the defendant's acquaintances brought the body to the defendant's home and then forced the defendant to dispose of the evidence. *Id.* Given that there was no evidence that the defendant participated in the crime prior to the murder, the court of appeals held that it was improper to infer his prior participation based solely on his subsequent destruction of evidence. *Id.* at 382-83.

This case is distinguishable from *Pesina* because there is substantial evidence that Robinson was the primary actor in these murders. *See id.* at 381-82 (noting no evidence defendant

9

acted alone or as primary actor). Unlike in *Pesina*, the evidence against Robinson is not limited to weapons or clothing from the crime scene being found in Robinson's home. The evidence also shows that Robinson used his cell phone, of which he was in possession at the time of his arrest, to call the victim four times as he drove from Waco to Austin the morning before these murders. Robinson's cell phone calls also place him in the vicinity of the crime scene for several hours leading up to the shootings and then returning to Waco after the murders. Further, an eye witness places a vehicle matching Robinson's SUV in front of the crime scene prior to the shooting. Investigators found the murder weapon, bloody clothes, and other physical evidence relating to the shooting in Robinson's Waco home, and Robinson's SUV tested positive for gunshot residue as well as the presumptive presence of blood. From this evidence, the jury could reasonably infer Robinson's participation in the actual shooting from more than his mere subsequent possession of incriminating evidence.

Furthermore, the Texas Court of Criminal Appeals has recognized that inference stacking, i.e., the drawing of a series of multiple reasonable inferences based on direct or circumstantial evidence, can be a proper reasoning process. *Hooper*, 214 S.W.3d at 15-17. As the court of criminal appeals explained, "[r]ather than using the language of inference stacking, courts of appeals should . . . determine whether the necessary inferences are reasonably based upon the combined and cumulative force of all evidence when viewed in the light most favorable to the verdict." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Giving proper deference to the jury, we find that the cumulative force of all the evidence presented in this case is sufficient to support the inference that Robinson was the primary actor in this shooting. Robinson's first point of error is overruled.

**Evidence obtained pursuant to search warrants**

In his second, third, and fourth points of error, Robinson claims that the trial court erred in denying his motions to suppress evidence obtained pursuant to search warrants for his home, SUV, and DNA, respectively. Robinson claims that the affidavits supporting the search warrants for his home and SUV did not establish probable cause to believe that evidence of the shooting would be found at either location. Furthermore, Robinson argues that the affidavit supporting the search warrant for his DNA relied on evidence obtained pursuant to the invalid searches of his home and SUV, and thus the seizure of his DNA was not supported by probable cause. *See Pitonyak v. State*, 253 S.W.3d 834, 847-48 (Tex. App.—Austin 2008, pet. ref'd) (explaining exclusion of evidence is proper when affidavit for search warrant contains unlawfully obtained information and untainted information alone does not support probable cause).

*Standard of review*

Ordinarily, a trial court's ruling on a motion to suppress is reviewed under a bifurcated standard, giving almost total deference to the trial court's findings of fact but reviewing conclusions of law de novo. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). However, when ruling on a motion to suppress evidence obtained pursuant to a search warrant, a trial court is limited to the four corners of the affidavit supporting the warrant and thus makes no factual or credibility determinations. *Id.* Therefore, we review a trial court's ruling on motions to suppress evidence obtained pursuant to search warrants under a unique standard. *See State v. Webre*, 347 S.W.3d 381, 384 (Tex. App.—Austin 2011, no pet.). This standard requires both trial and appellate courts to be highly deferential to a magistrate's decision to issue a search

11

warrant, reflecting the constitutional preference that searches be conducted pursuant to a warrant. *McLain*, 337 S.W.3d at 271; *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007).

Reviewing courts must determine whether the magistrate had a substantial basis for concluding that probable cause existed. *State v. Jordan*, 342 S.W.3d 565, 569 (Tex. Crim. App. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). Probable cause exists when, considering the totality of the circumstances, there is a "fair probability that . . . evidence will be found at the specified location." *Rodriguez*, 232 S.W.3d at 60 (internal quotations omitted). While our review is limited to the four corners of the affidavit, we interpret the affidavit in a "commonsensical and realistic manner, recognizing that the magistrate may draw reasonable inferences. When in doubt we defer to all reasonable inferences that the magistrate could have made." *Id.* at 61.

*Analysis*

Robinson claims that the affidavits supporting the search warrants for his home and SUV failed to establish probable cause that evidence related to the shooting would be found at either location. Given the totality of the circumstances set forth in the affidavit, we cannot agree that the magistrate lacked a substantial basis for concluding that evidence related to the murders would be found in Robinson's home and SUV. *See Jordan*, 342 S.W.3d at 569.

The affidavits supporting the warrants give a detailed account of the investigation leading up to the issuance of the warrants, including the cell phone tracking information placing Robinson in the vicinity of the crime. In particular, with regard to Robinson's home and SUV, the affidavits state the following: (1) "a neighbor saw a black SUV drive away very fast" after the

12

shooting; (2) Robinson's girlfriend "owns a small, black, SUV"; (3) an officer previously noted that Robinson kept a .38 caliber revolver in his home; (4) the bullets that were recovered from the crime scene were consistent with that of a .38 or .357 caliber revolver; and (5) the affiant's experience in criminal investigations leads him to "believe that items capable of collecting saturated blood [and other evidence], including but not limited to clothing, vehicle upholstery, carpet, [and] floor mats are located" in Robinson's home and SUV.

Considering the totality of the affidavit, the magistrate could reasonably infer that Robinson was involved in the shooting of Nieto and Mekonen. Additionally, the magistrate could reasonably have believed that evidence relating to the shooting would be found in Robinson's SUV given that it could have been used to flee the crime scene. Finally, the magistrate could have reasonably inferred that evidence relating to the shooting would be found in Robinson's home given that he had previously kept a .38 caliber revolver at his home, and common sense suggests that clothing and other items capable of carrying forensic evidence would be kept in the home. *See Rodriguez*, 232 S.W.3d at 60. Therefore, we find that the magistrate had a substantial basis for concluding that evidence of the shooting would be found in Robinson's home and SUV. *See id.* Thus, the trial court did not err in denying Robinson's motion to suppress evidence seized from his home and SUV. Robinson's second and third points of error are overruled.

Furthermore, we find that the magistrate had a substantial basis for issuing the search warrant for Robinson's DNA samples. The affidavit supporting this search warrant listed all of the evidence recovered from the previous searches, including the revolver and clothes from the burning bag as well as Robinson's statements while in custody. Given that the searches of Robinson's home

13

and SUV were valid, the affidavit for Robinson's DNA could properly include information obtained during those searches. Furthermore, the affidavit was sufficient to establish probable cause for the seizure of Robinson's DNA given the affidavit's explanation of the physical evidence and Robinson's statement that the clothes he attempted to destroy belonged to another suspect. Because the affidavit provided a substantial basis for the magistrate to conclude that probable cause existed for the seizure of Robinson's DNA samples, we conclude that the trial court did not err in denying Robinson's motion to suppress. Robinson's fourth point of error is overruled.

**Admissibility of expert testimony**

In points of error five through eight, Robinson argues that the trial court erred in admitting the testimony of two of the State's expert witnesses. *See* Tex. R. Evid. 702. Specifically, Robinson claims that Deputy Wright did not qualify as an expert with regard to the method of tracking cell phone activity. Furthermore, Robinson claims that Valdez's testimony about the similarity of physical evidence recovered from the crime scene and Robinson's home should have been excluded because her method of analysis was unreliable. Robinson also argues that Valdez's testimony was irrelevant and overly confusing. *See id*. 401, 403.

*Standard of review*

There are three separate conditions for the admissibility of expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers v. State*,

14

205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *see also* Tex. R. Evid. 401, 402, 702. These conditions are commonly referred to as qualification, reliability, and relevance. *Vela v. State*, 209 S.W.3d 128, 130-31 (Tex. Crim. App. 2006). Before admitting expert testimony, the trial court must determine that all three conditions are met. *Id.*

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). Therefore, we will uphold a trial court's ruling on the admissibility of an expert witness as long as it falls "within the zone of reasonable disagreement." *Id.*; *see also Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) ("The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion."). Similarly, we review the trial court's ruling on the relevancy and probative value of evidence for an abuse of discretion. *See Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

*Qualification of Deputy Wright as an expert*

Robinson argues that, based on the qualifications presented, the trial court abused its discretion in allowing Deputy Wright to testify as an expert in tracking cell phone activity. *Rodgers*, 205 S.W.3d at 527. There is no rigid formula for determining when an expert is qualified to testify. *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App.—Austin 1999, pet. ref'd). In order to provide guidance, the court of criminal appeals has listed three criteria that appellate courts should consider when reviewing a trial court's determination of an expert's qualification: "(1) 'is the field of expertise complex?'; (2) 'how conclusive is the expert's opinion?'; and (3) 'how central is the area of expertise to the resolution of the lawsuit?'" *Vela*, 209 S.W.3d at 131 (quoting *Rodgers*, 205 S.W.3d at 528).

15

Because a witness will not always qualify as an expert by virtue of general background, the proponent of the expert must show that the expert has sufficient "knowledge, skill, experience, training, or education regarding the specific issue before the court" that would qualify the expert to give an opinion on that particular subject. *Vela*, 209 S.W.3d at 132 (internal quotations omitted). The focus is on the "fit" between the subject matter of the testimony and the expert's familiarity with that subject matter. *Id.* at 133.

At trial, Deputy Wright testified that he had completed three years of college course work in criminal justice. Though he did not complete his degree, he testified that he had worked for the Travis County Sheriff's Office for fourteen years, the last four of which he worked as a special deputy in the criminal intelligence unit assigned to the United States Marshals' Violent Fugitive Task Force. Deputy Wright explained that his intelligence unit used "cell phones, MySpace pages, and any kind of computers" or technology to track the location of fugitives or persons under investigation and that "[w]ith cell phones we are able to locate where people are based off cell tower readings and other techniques." Deputy Wright also testified that he had completed a three-day training course in reading cell phone records, identifying cell phone tower locations, and plotting and tracking cell phone activity. As a result of this training, Deputy Wright was certified to read cell phone records.[6]

In addition, Deputy Wright testified that while cell phone technology had advanced since his training, the type of data used to track phone activity had remained the same. He stated that when cell phones place or receive calls, they "reach out" to connect to the nearest cell tower, which

---

[6] Deputy Wright stated that the United States Marshals Service operated the training course, but he could not recall "who back[ed]" his certification.

must be within a two-mile radius of the phone's location in order for the phone to receive a signal. He further stated that the phone records that the Sheriff's office subpoenaed indicate the longitude and latitude of the cell tower that the cell phone connected with for each incoming or outgoing call. Based on this data, Deputy Wright testified that he could plot the location of each cell tower that Robinson's calls were relayed to in order to track Robinson's location to within a two mile radius.

Robinson argues that because the State failed to show how often Deputy Wright had actually tracked suspects using their past cell phone activity, Deputy Wright should not have been qualified as an expert. Given Deputy Wright's training and experience with the criminal intelligence unit, we disagree.

In reviewing the trial court's ruling on Deputy Wright's qualification, we first consider whether the field of expertise on which his testimony is based is complex. *See Rodgers*, 205 S.W.3d at 527-28. "The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify." *Id*. At trial, Deputy Wright described for the jury how he used the locations of the cell phone towers that relayed Robinson's calls to track the location of Robinson's phone to a particular geographic area. This process, as described by Deputy Wright, involved reading and analyzing cell phone records based on a general understanding that cell phones connect to the nearest tower location when a call is placed. The analysis is straightforward and not particularly complex. Deputy Wright's qualifications—his education and his law enforcement experience, including his four years of experience working in the criminal intelligence unit and the training course he took in the use of cell phone  tracking—were sufficient such that his testimony would "assist the trier of fact to understand the evidence." Tex. R. Evid. 702; *see Wilson v. State*, 195 S.W.3d 193, 200-02

17

(Tex. App.—San Antonio 2006, no pet.) (holding that cell phone company employee was qualified to testify about cell phone tracking based on training and experience in interpreting cell phone records).

With respect to the second and third prongs, we find that Deputy Wright's testimony was not conclusive nor dispositive. *See Vela*, 209 S.W.3d at 131. Deputy Wright's testimony shows that on the day of the murders Robinson traveled from Waco to Austin, that he was in the vicinity of the crime scene shortly before the shooting, and that he had made several phone calls to one of the victims that day. While this evidence tends to connect Robinson to the crime scene, it does not, by itself, conclusively connect Robinson to the crime. As previously explained, the jury heard other ample evidence connecting Robinson to the shooting. After reviewing all three criteria, we conclude that the trial court did not abuse its discretion in determining that Deputy Wright was qualified to testify as an expert. *See Sexton*, 93 S.W.3d at 99. Robinson's fifth point of error is overruled.

*Reliability of Valdez's analysis*

Robinson claims that Valdez's expert testimony should have been excluded because the methodology Valdez employed is unreliable. *See Vela*, 209 S.W.3d at 133-35. The party proffering the expert testimony has the burden of showing by clear and convincing evidence that: "(1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question." *Sexton*, 93 S.W.3d at 100 (citing *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)). The court of criminal appeals has provided the following seven non-exclusive factors that trial courts may use to determine whether scientific testimony is reliable:

18

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained, (2) the existence of literature supporting or rejecting the underlying scientific theory and technique, (3) the clarity with which the underlying scientific theory and technique can be explained to the court, (4) the potential rate of error of the technique, (5) the availability of other experts to test and evaluate the technique, (6) the qualifications of the expert(s) testifying, and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id*. at 100 (citing *Kelly*, 824 S.W.2d at 572).

Valdez stated that she performed a side-by-side visual comparison of the physical characteristics of the tapes recovered from the crime scene and Robinson's home. Valdez testified that the method she used to compare the duct tapes was "based on research that had been presented both in the forensic field . . . [and] specific forensic research that has been formed, as well as the training that [she] received." She stated that the "analysis that [she] performed in the laboratory is not necessarily new or novel" and that it had been the accepted forensic practice for many years. The technique and underlying scientific theory for comparing the tapes was clear and is consistent with the commonsense understanding that tapes with similar physical characteristics are more likely to be from a common source than those that have different characteristics. *See Vela*, 209 S.W.3d at 135-36; *Sexton*, 93. S.W.3d at 99-100. Therefore, we conclude that the trial court did not abuse its discretion in determining that Valdez's methodology was reliable. *See Sexton*, 93 S.W.3d at 99-100. Robinson's sixth point of error is overruled.

*Relevancy of Valdez's testimony*

Robinson also argues that Valdez's testimony should have been excluded as irrelevant and overly confusing. *See* Tex. R. Evid. 401, 403; *see also Jackson*, 17 S.W.3d at 670 ("[A] trial

19

court's responsibility is to determine whether proffered scientific evidence is sufficiently reliable and relevant."). Evidence is relevant if it has any tendency to make the existence of any fact of consequence more likely than it would be without the evidence. Tex. R. Evid. 401. "It is important, when determining whether evidence is relevant, that courts examine the purpose for which the evidence is being introduced." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

In this case, the tapes from the crime scene and Robinson's home were offered to show that because the tapes were similar, it is more likely that they came from a common source, and if they came from a common source, it is more likely that the tape in Robinson's home came from the packaging for the marijuana in Nieto's home. If true, this evidence would tend to prove that Robinson took the marijuana from Nieto's home, which would place Robinson at the crime scene and explain his motive for shooting Nieto and Mekonen, i.e., the theft of the narcotics. These are facts of consequence in this case, and thus the similarity of the tapes is relevant. *See Layton*, 280 S.W.3d at 240. Valdez explained the number of ways in which the tapes were similar, some of which may not have been ascertainable by the jury. Thus, Valdez's testimony added "precision and depth" to the jury's understanding of the similarities of the tapes and was therefore relevant to show that Robinson was at the crime scene and had a motive for shooting the victims. *See Rodgers*, 205 S.W.3d at 527-28 ("An expert may add precision and depth to the ability of the trier of fact to reach conclusions about subjects which lie within the common experience.") (internal quotations omitted).

Relevant evidence is generally admissible unless its probative value is substantially outweighed by some other concern, such as misleading the jury. *See* Tex. R. Evid. 402, 403; *see also Gigliobianco v. State*, 210 S.W.3d 637, 640-41 (Tex. Crim. App. 2006). Rule 403 creates the

20

presumption of admissibility, excluding relevant evidence only when there is a clear disparity between its probative value and harmful effects. Tex. R. Evid. 403; *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). Admittedly, the probative value of Valdez's testimony is relatively low given that she could not say how likely it was that the tapes shared a common source. However, Valdez's testimony was clear, concise, and not overly technical, making it less likely that it would distract the jury from the main issues of the case. *See Gigliobianco*, 210 S.W.3d at 641 ("Evidence that consumes an inordinate amount of time to present or answer . . . might tend to confuse or distract the jury from the main issues."). Therefore, while the probative value of Valdez's testimony may have been slight, the danger of confusion was equally minimal. *See id.* Thus, the limited harmful effect of Valdez's testimony did not substantially outweigh its probative value, and the trial court did not abuse its discretion in refusing to exclude Valdez's testimony.

Even if the trial court had abused its discretion in admitting Valdez's testimony, we conclude that the error would be harmless. Incorrect evidentiary rulings do not generally rise to the level of violating the constitution. *See Potier v. State*, 68 S.W.3d 657, 662-63 (Tex. Crim. App. 2002). Therefore, this non-constitutional error is not ground for reversal because "after examining the record as a whole" we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (internal quotations omitted). Valdez's testimony tends to show that Robinson was at the crime scene. Given that other evidence, including Robinson's possession of the murder weapon and clothing which contained a victim's DNA, placed Robinson at the crime scene, Valdez's testimony likely had little or no effect on the jury. *See Davis v. State*, 203 S.W.3d 845, 852-53 (Tex. Crim. App. 2006) (noting

error admitting cumulative evidence usually harmless). Robinson's seventh and eighth points of error are overruled.

**Williams's competency to testify**

In his final issue on appeal, Robinson claims that the trial court erred in admitting the testimony of Williams, Nieto's neighbor. Specifically, Robinson argues that Williams was incompetent to testify about her observations on the day of the shooting given her admission that she "wasn't really paying attention" and her inability to recollect conversations with investigators. *See* Tex. R. Evid. 601. Robinson objected to Williams's competency and moved to strike her testimony after cross-examination.[7] The trial court overruled this objection. We review a trial court's determination of a witness's competency for an abuse of discretion. *See Broussard v. State*, 910 S.W.2d 952, 960 (Tex. Crim. App. 1995).

There is a presumption that every witness is competent to testify. *See* Tex. R. Evid. 601(a); *Davis v. State*, 268 S.W.3d 683, 699 (Tex. App.—Fort Worth 2008, pet. ref'd). A witness is competent to testify if (1) she can intelligently observe events at the time of their occurrence, (2) she has the capacity to recollect those events, and (3) she has the capacity to narrate those events to the jury. *Torres v. State*, 33 S.W.3d 252, 255 (Tex. Crim. App. 2000) (citing *Watson v. State*, 596 S.W.2d 867, 910 (Tex. Crim. App. 1980)).

---

[7] The State argues that Robinson's objection to Williams's competency was not timely and thus not preserved for appeal. *See* Tex. R. App. P. 33.1(a); *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997). Given the limited scope of direct examination, it is unclear whether Robinson had a basis to object to Williams's competency before the end of cross-examination. *Lagrone*, 942 S.W.2d at 618 ("An objection should be made as soon as the ground for the objection becomes apparent."). Therefore, we assume without deciding that Robinson's objection to Williams's competency was timely.

Robinson claims that Williams fails to satisfy the second element of competency, i.e., a capacity to recollect. Williams testified that she could not remember speaking with investigators on the day of the shooting and admitted that she "wasn't really paying attention" to the cars parked in Nieto's driveway. However, she testified that she saw a small black SUV parked on the street in front of Nieto's home on the day of the shooting. Furthermore, she identified a picture of a Mercedes SUV as being the same model as the vehicle she observed. Overall, Williams's testimony reflects an ability to recollect relevant events. Any inconsistencies or inabilities to recall certain facts do not render Williams incompetent to testify, but go to the credibility of her testimony—an issue for the jury. *See Rodriguez v. State*, 772 S.W.2d 167, 173 (Tex. Crim. App. 1989); *see also De los Santos v. State*, 219 S.W.3d 71, 81 (Tex. App.—San Antonio 2006, no pet.). Given the totality of Williams's testimony, we cannot say that the trial court abused its discretion by finding her competent to testify. *Broussard*, 910 S.W.2d at 960. Robinson's final point of error is overruled.

## CONCLUSION

Having overruled all of Robinson's issues on appeal, we affirm the judgment of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed: February 24, 2012

Publish

23