NO. F10-59304-K

706-15

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

ORIGINAL

ANTONIO PATTERSON          APPELLANT/PETITIONER
              V.
THE STATE OF TEXAS          APPELLEE/PETITIONER

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

IN APPEAL NO. 05-13-00450
           FROM THE
       COURT OF APPEALS
FOR THE FIFTH JUDICIAL DISTRICT
       DALLAS, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

SEP 23 2015

Abel Acosta, Clerk

ANTONIO PATTERSON #1850883
3899 STATE HWY 98
TELFORD UNIT
NEW BOSTON, TEXAS 75570

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 21 2015

Abel Acosta, Clerk

# TABLE OF CONTENTS

LIST OF PARTIES ................................ PAGE 2

INDEX OF AUTHORITIES ...................... PAGE 3

STATEMENT OF THE CASE .................. PAGE 4

STATEMENT OF THE FACTS .............. PAGE 5,6

ARGUMENT .......................................... PAGE 7,8

PRAYER ................................................ PAGE 9

CERTIFICATE OF SERVICE .................. PAGE 9

# LIST OF PARTIES

APPELLANT
ANTONIO PATTERSON

DEFENSE COUNSEL AT TRIAL
ANDREW PRICE
DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
FRANK CROWLEY COURTS BUILDING
133 N. RIVERFRONT BLVD. LB 2
DALLAS, TEXAS    75207 - 4399

STATE'S ATTORNEY AT TRIAL
ALBERT ROBERTS AND JUSTIN LORD
DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE
133 N. RIVERFRONT BLVD. LB - 19
DALLAS, TEXAS    75207 - 4399

APPELLANT'S ATTORNEY ON APPEAL
KATHRINE A. DREW
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
FRANK CROWLEY COURTS BUILDING
133 N. RIVERFRONT BLVD. LB-2
DALLAS, TEXAS   75207 - 4399

STATE'S ATTORNEY ON APPEAL
CRAIG WATKINS [ OR HIS DESIGNATED REPRESENTATIVE ]
DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE
FRANK CROWLEY COURTS BUILDING
133 N. RIVERFRONT BLVD. LB -19
DALLAS TEXAS  75207 - 4399

# INDEX OF AUTHORITIES

MORENO V STATE 755 S.W. 2d 866 (TEX. CRIM. APP. 1988)

ALAMANZA V 686 S.W. 2d AT 172

TREJO V STATE 127 S.W. 546, 548 (TEX. CRIM. APP. 1903)

## STATEMENT OF THE CASE

APPELLANT WAS CHARGED BY INDICTMENT WITH AGGRAVATED ROBBERY IN VIOLATION OF TEX. PENAL CODE 29.03. CRI:12 J. APPELLANT PLED NOT GUILTY TO THIS OFFENSE. (RR 4: 8, 26-27) A JURY FOUND APPELLANT GUILTY AND SUBSEQUENTLY ASSESSED PUNISHMENT AT LIFE IMPRISONMENT. (CRI 98, 103, 104 RR8: 8 127.) JUDGMENT WAS ENTERED ON MARCH 26 2013 (CRI 104) APPELLANT FILED TIMELY NOTICE OF APPEAL. (CRI:112)

# STATEMENT OF THE FACTS

At 4:28 P.M. on February 27 2010 Dallas fire-fighters received an alarm concerning a vehicle fire. RRS:74. Within minutes firefighters located a burning Ford Escort under a bridge at 5600 Railroad C.F. Hawn Freeway; the vehicle was "fully involved in flames". (RRS 74 75 96.) The firefighter extinguished the fire and subsequently discovered a person in the trunk who was later identified as William Artis. (RRS 76 79).

While William was still alive he was unconscious unresponsive and not breathing adequately but rather "leaning toward respiratory arrest." (RRS: 76 77.) William was ultimately determined to have third degree burns on both arms and legs a gunshot wound to his right leg and an injury or trama to his head. (RR4: 72, 88; RRS: 79).

Because emergency responders did not believe that William would survive Dallas Homicide Detective were initially contacted. (RRS: 82 83) While William did survive, he was in the hospital and a rehabilitation facility for several months. (RR4: 35 44 88 89 92). His injuries were severe enough to necessitate the amputation of one of his legs. (RR4 35 45 88 91). William maintained the ability to read but could no longer write due to the brain damage suffered from smoke inhalation. (RR4 45 87). He underwent multiple skin grafts. (RR4 90) His voice was "messed up" as a result of some of his treatment in the hospital. (RR4 87-88) At the time of trial he was still struggling to walk. (RR4: 44-45, 87).

PAGE 5.

Williams injuries came about as the result of what his mother described as a "drug deal gone bad." RR4: 48). Unbeknownst to his parents, William had been selling marijuana with the help of a friend Kelvin Brooks. (RR 4: 47, 63, 54, 59, 60). Brooks helped William make connections with buyers, including his uncle James Bernard Collins, aka James Bernard Norton. (RR4: 60 63 147). Collins sold crack cocaine. (RR4 143 161). He had been approached by William and Brooks about selling marijuana; William gave him a "free sample." (RR4 147 152-53 156). William ask Collins if he knew other people who wanted to buy marijuana and asked for phone numbers of people to call as potential buyers. RR5: 28-29). In Collins' opinion, William was selling good marijuana "cheap" and was not "street savvy" RR4 149-150). William admitted he was not very experienced in the drug business. (RR4 59-60).

On February 27 2010 William went to Collins' apartment in East Dallas to sell him some marijuana. (RR4 65-69,,161) RR5 29 43 45). Prior to arriving at Collins apartment William and Collins spoke on the phone. (RR4: 68 155-156). At this point however the version of events leading up to and including the robbery shooting and fire becomes significantly different between Collins and William.

## ARGUMENT

HERE THE FIFTH COURT OF APPEALS DID COMMITT EGREGIOUS ERROR IN THEIR RULING OF MY APPELLATE BRIEF

THE PETITIONER NOW ARGUES THE APPELLANT COURT'S RUBBER STAMPING EVERY CLAIM OF "THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION BECAUSE THE TESTIMONY OF THE ACCOMPLICE WAS NOT CORROBORATED. AND THE TRIAL COURT ABUSED IT'S DISCRETION BY REFUSING TO CONDUCT A HEARING PRIOR TO ADMITTING TESTIMONY CONCERNING THE INTERPRETATION OF APPELLANT'S CELLULAR PHONE RECORDS AND THAT IS GIVING THE STATE A BENEFIT TO WHICH IT IS NOT ENTITLED TO.

HERE IN THE CASE AT BAR IT IS FIRMLY FOUNDED IN THE RECORD THAT THE VICTIM FOREKNOWLEDGE OF TESTIMONY HAS PROVEN TO HAVE SHOWN THAT THE PETITIONER IS INNOCENT BEYOND A REASONABLE DOUBT.

THE COURT OF APPEALS SHOULD NOT SIT AS A 13TH. JUROR BUT POSITION ITSELF AS A FINAL DUE PROCESS SAFEGUARD TO ENSURE THE RATIONALITY OF THE JURY'S DECISION. MORENO V STATE 755 S.W 2d. 866 [TEX CRIM. APP 1988]

FOR THE ABOVE REASON PETITIONER HAS SHOWN THAT FIFTH APPEALS COURT COMMITTED EGREGIOUS ERROR IN THEIR RULING, ALAMANZA 686 S.W. 2d AT 172.

THE VERY IDEAL OF THIS BY THE SAID COURT IS EGREGIOUS ERROR IN NATURE AND NOT ONLY EGREGIOUSLY HARMFUL TO THE PETITIONER BUT TO SOCIETY AS A WHOLE.

A LONG TIME RULE IN TEXAS APPELLATE PROCEDURES HAS BEEN ON DIRECT APPEAL, THE RECORD IN ITSELF CAN NOT BE ADDED TO THEREFORE THE FIFTH COURT OF APPEALS TO SUGGEST THIS ERROR.

AS THE COURT OF CRIMINAL APPEALS NOTED OVER A CENTURY AGO "IT HAS LONG BEEN A PRINCIPLE IN OUR JURISPRUDENCE THAT WHERE AN ISSUE IN A CRIMINAL CASE IS LEFT IN DOUBT BY THE EVIDENCE, AS IN THE CASE AT BAR THE DOUBT SHOULD ALWAYS BE RESOLVED IN FAVOR OF THE ACCUSED.

It IS AT THIS POINT THAT THE PRESUMPTION OF INNOCENCE AND REASONABLE DOUBT HAVE PARTICULAR MEANING" TREJO V STATE 127 S.W. 546, 548 [TEX CRIM. APP. 1903 ]

## PRAYER FOR RELIEF

FOR THE REASONS STATED ABOVE IT IS RESPECTFULLY SUBMITTED THAT THE COURT OF CRIMINAL APPEALS OF TEXAS SHOULD GRANT THIS PETITION FOR DISCRETIONARY REVIEW.

RESPECTFULLY SUBMITTED,

ANTONIO PATTERSON #1850883
TELFORD UNIT
3899 STATE HWY 98
NEW BOSTON, TEXAS 75570

## CERTIFICATE OF SERVICE

THE UNDERSIGNED APPELLANT PETITIONER HEREBY CERTIFIES THAT A TRUE AND CORRECT COPY OF THE FOREGOING PETITION FOR DISCRETIONARY REVIEW HAS BEEN MAILED U.S. MAIL POSTAGE PREPAID, TO THE OFFICE OF THE CRIMINAL DISTRICT ATTORNEY FOR DALLAS COUNTY FRANK COURT BLDG. 133 N. RIVERFRONT BLVD LB-19; DALLAS, TEXAS 75207 AND TO THE STATE PROSECUTING ATTORNEY P.O. BOX 12405 AUSTIN TEXAS 78711 ON THIS THE 14TH DAY OF SEPTEMBER, 2015

RESPECTFULLY,

ANTONIO PATTERSON
# 1850883

**AFFIRMED; Opinion Filed May 19, 2015.**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

No. 05-13-00450-CR

**ANTONIO PATTERSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause No. F10-59304-K**

# OPINION

Before Justices Myers, Evans, and O'Neill[1]
Opinion by Justice Myers

A jury convicted appellant Antonio Patterson of aggravated robbery with a deadly weapon and assessed punishment at life imprisonment. In two issues, appellant argues that the evidence is insufficient to support the conviction because the testimony of the accomplice witness was not corroborated; and (2) the trial court abused its discretion by refusing to conduct a hearing before admitting testimony regarding the interpretation of appellant's cellular telephone records. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

At 4:28 p.m. on the afternoon of February 27, 2010, Dallas firefighters responded to an alarm at 5600 Railroad Avenue and the C.F. Hawn Freeway, in Dallas County, Texas. When

---

[1] The Honorable Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Dallas, Retired, sitting by assignment.

they arrived at the location four minutes later, at 4:32 p.m., they found a burning Ford Escort parked under the freeway bridge. The vehicle's passenger area was "fully involved in flames," according to Dallas firefighter Graham Pearson, who was one of the firefighters that responded to the call. After they extinguished the fire, firefighters looked in the trunk and found William Artis, then twenty-two years of age. He was still alive but unconscious, and had third degree burns to both of his arms and legs, a gunshot wound to his right leg, head trauma, and had suffered severe smoke inhalation. Artis's injuries were so serious that he spent several months in the hospital and a rehabilitation facility recuperating. He underwent multiple skin grafts and had a metal plate inserted into his thigh to repair a shattered femur. His right leg was amputated below the knee, and the brain damage he suffered because of the smoke inhalation left Artis unable to write, although he could still read. By the time this case was tried, in March of 2013, Artis was struggling to learn how to walk again.

Artis's mother, Vicki, agreed that her son's injuries resulted from "a drug deal gone bad." Although his parents did not know it at the time, Artis had been selling marijuana with the help of a friend, Kelvin Brooks,[2] to earn extra money. Brooks assisted Artis in connecting with buyers, including Brooks's uncle, James Bernard Collins, the accomplice witness in this case, who also went by the name of James Bernard Norton. Collins had a job but sold crack cocaine to make some money "on the side." He testified that he had been approached by Artis and Brooks about selling marijuana for them. He told them that he was not going to sell marijuana for them, but was interested in buying it. Artis gave Collins some marijuana as a "free sample." Collins and Artis talked on the telephone about Collins buying two quarter pounds of marijuana from Artis. Collins thought Artis was selling good marijuana "cheap," but knew he lacked "street savvy." Artis testified that he did not have a lot of experience in the drug business. On February

---

[2] Kelvin Brooks is sometimes mistakenly referred to in the record as Kevin Brooks.

27, 2010, Artis went to Collins's apartment in east Dallas to sell him some marijuana.

Collins was in jail at the time he testified and was charged with the instant aggravated robbery.[3] He testified that, when he and Artis spoke on the telephone about buying marijuana, they also discussed whether Collins knew anyone who wanted to buy a TEC-9 gun. Collins replied "yeah" because he knew that appellant, who was at Collins's apartment when Artis called, wanted to buy a gun. When Collins asked appellant, also known as Molock, if he knew anyone who wanted to buy a gun, appellant asked what type of gun it was. Collins said it was a TEC-9, and appellant retorted that Artis "must want to get robbed. Who brings a gun to a drug deal?" Collins told Artis to bring the gun with him. Once Collins informed appellant that Artis was on his way and would bring two pounds of marijuana, appellant indicated that he wanted to "jack" Artis, i.e., rob him of his money and his marijuana. Collins told appellant that he wanted to get his marijuana first. Appellant assured Collins he would handle the situation, saying, "I am going to take care of everything for you. I got you." Collins admitted at trial that he and appellant were setting Artis up to be robbed.

Artis arrived at Collins's apartment carrying the marijuana and the gun in a shoebox. Collins and Artis went into the kitchen, where appellant was sitting in a chair. When Artis put the marijuana on a digital scale, appellant hit him on the back of the head with a .357 gun. Artis grabbed his head and fell to the kitchen floor; appellant also sprayed him with mace. Artis screamed and cried. He was bleeding from his head. Collins testified that he did not expect appellant to hit Artis with a gun; he thought he would just draw his pistol on him and take his money. He recalled that he berated appellant, demanding to know why he was doing this in his apartment, and that he scolded him for getting blood all over the floor. Appellant assured Collins

---

[3] Collins had previously been imprisoned for burglary of a habitation and aggravated robbery. In return for his testimony, the State agreed to strike the enhancement paragraph from Collins's indictment, thus making his minimum punishment range five instead of fifteen years.

that he had nothing to worry about and "[t]his ain't going to fall back on you. I got you." Collins understood this to mean that appellant intended to kill Artis.

Appellant pointed the gun at Artis and demanded to know "where the money was." Artis said it was in the car under the back seat. Appellant went out to get the money. When he returned, he asked appellant, "Where the rest of the money at?" Artis told appellant that he had $15,000 at his house and that he would give it to appellant if he spared his life. As Artis was lying on the ground, appellant took out Artis's wallet and looked at the identification. He asked, "Man, is this where you live at?" Artis said, "Sir, this is where I live at." Appellant pretended to make a phone call in which he said "[Y]eah, I'm sending somebody over there right now." Artis said, "Man, I promise you, if you take me there I will give you the money." Appellant then told Collins he was going to take Artis "somewhere." Appellant backed Artis's car to the door of the apartment and, at gunpoint, ordered him to get in the trunk. Artis complied.

Appellant gave Collins his car keys and told Collins to follow him. Appellant drove the Ford Escort and Collins followed closely behind in appellant's car, a black Pontiac. They stopped at a 7-Eleven. Appellant got an empty soda bottle and poured some gasoline into the bottle. They drove to another location, where appellant told Collins to park away from appellant. Appellant got out of Artis's car and shot into the trunk—where Artis was still confined—through the back seat. Appellant then poured gasoline on the trunk of the car and inside the car. He lit a piece of paper on fire and threw it into the car, setting it alight. Appellant ran to his car, where Collins was waiting, and drove Collins back to his apartment. Appellant had the shoebox with the TEC-9 gun with him when he got into the car. Collins testified that appellant used this gun to shoot into the trunk. Appellant continued to assure Collins that he had nothing to worry about, and he promised to pay him for "letting me do that right there," and for letting him stay at Collins's apartment "and keep my stuff there." Collins subsequently learned that appellant had

—4—

given "somewhere around" $900 to Brittany, Collins's "baby momma," that was intended for Collins. Collins estimated this was approximately half of the money they had taken from Artis.

Collins testified that he kept his distance from appellant after the offense because it was "on a whole different level" from anything he had done before. Collins had been to prison for robbery but, he added, "Wasn't nobody done like that." After Collins's arrest, he was questioned by a police detective. Collins admitted that he lied to the detective, initially telling her that he knew nothing about the robbery, and later telling the police that the crime was committed by appellant and a person named "A-Dog."

Collins's cell phone records from February 2010 were admitted into evidence as State's exhibit 136, and these records showed telephone calls from appellant to Collins on February 27, 2010. A printed page of appellant's MetroPCS phone records, admitted into evidence as part of State's exhibit 141, also showed telephone calls from appellant to Collins on the date of the offense.

Two Dallas police detectives testified about the cell phone records. Detective Elena Perez testified that she identified appellant's cell phone number from Collins's phone records. She then obtained appellant's phone records through a court order. Detective Perez compared the phone records of appellant and Collins and learned that two of the telephone calls from appellant to Collins were received at 4:11 p.m. and 4:17 p.m. The State published one page of appellant's phone records that showed the 4:11 p.m. and 4:17 p.m. phone calls.

Detective John Franco testified that he typed in the addresses of specific cell phone tower locations and then printed maps from Google Earth that showed those tower locations. The six maps from Google Earth—admitted without objection as State's exhibits 147 to 152— showed the locations of cell towers where certain telephone calls between Collins and appellant were "hitting" at the time of the offense. Detective Franco testified as to which cell towers the calls

were "hitting off" at various times on February 27, 2010. One of the Google Earth maps, State's exhibit 150, showed the location of cell tower 144, where the phone calls made by appellant to Collins between 4:03 p.m. and 4:17 p.m. were "hitting," and the offense location at 5600 Railroad Avenue. The distance between the location where the burning car was found and the cell phone tower was approximately 7/10 of a mile. Detective Franco testified regarding the route a car might have traveled based on the cell phone towers and the Google Earth maps. On cross-examination, Detective Franco testified that appellant's phone records showed multiple calls "hitting" off of cell tower 144 during the month of February, 2010.

Artis testified that he started selling marijuana in May of 2009. Kelvin Brooks, a childhood friend, introduced Artis to some individuals who wanted to buy drugs, including Kelvin's uncle, James Collins. Artis did not know Collins's name and during his testimony he referred to Collins at various times as Kelvin, Kevin, or Kevin's uncle, brother, or cousin, because, according to Artis, Collins and Brooks looked alike. On February 27, 2010, Artis went to Collins's apartment to sell marijuana after having talked to Collins on the telephone earlier that day. Artis was driving his mother's red Ford Escort. He testified that he did not have any money on him. He had difficulty recalling certain details of the offense, such as whether he carried the marijuana in a bag or a box, whether he brought a scale, whether there were other people in the apartment when he went inside, and who took the keys out of his pocket. But he testified that he had the gun in his car and did not take it into the apartment. After Artis gave the marijuana to Collins, Collins hit Artis in the back of the head with a gun "pretty damn hard." Artis tried to turn around and saw a second person he did not know, who he referred to as "a big dude," come out of the hallway "right after that." He had never seen him before.

Collins pointed a gun at Artis's back and led him out of the apartment. Artis was then taken to his mother's car and ordered to get into the car. Collins was driving and the "big dude"

—6—

was in the passenger seat; Artis was in the back seat. He assumed at this point that he was being robbed. He asked if he could call Kelvin but the "big dude" told him, "You need to shut the fuck up." They drove around for a while. When the car finally stopped, one of two men—Artis's testimony is not clear as to which one—told him to get out of the car and get into the trunk. He was holding a gun. At some point after that, perhaps a couple of minutes or maybe five minutes, Artis was not sure, he felt a gunshot to his leg. He did not see who set fire to the car, but he testified that he eventually smelled smoke and the trunk of the car "started getting hot." He could see the inside of the car was burning. He reached a point where he could no longer breathe and, assuming he was going to die, lost consciousness.

Artis met with detectives several times. Detective Perez interviewed Artis on August 26, 2010. This interview, which was videotaped and admitted into evidence as State's exhibit 2, was played for the jury. Artis spoke softly during the interview and is sometimes difficult to understand, but he can be heard telling Detective Perez that "the big dude" put him in the trunk. Detective Perez then asked Artis if he remembered who shot him. He mumbled an inaudible response before saying, "The big dude." She asked, "The big dude shot you?" Artis replied that "the big dude" was the only person who could have shot him because that was the last person he saw before he was shot. Detective Perez reviewed this information with Artis, asking him again who put him in the trunk of the car. Artis replied, "I think the big dude." She asked whether the other individual, who Artis identified as "Kevin," was standing around during this time. Artis said, "I'm pretty sure, yeah." She also asked, "But you remember the big guy putting you in the trunk," to which Artis replied, "In the trunk, yeah." She added, "And you remember getting shot, and you say it was the big dude?" Artis answered, "Yeah, it was the big dude."

Artis was also shown photographic lineups. Detective Franco showed a lineup to Artis on August 26, 2010. Detective Franco testified Artis "was heavily damaged, heavily burned,"

when he was shown the lineup. Artis could not write or sign his name on the lineup form because of the pain he was in, but Detective Franco asked him to "make an X or draw a line," and Artis "was able to reach up and scribble" on the form. Artis identified a photograph of appellant, the fifth photo in the lineup, State's exhibit 3k, stating, "I remember seeing him." Detective Franco initialed, signed, and dated the photograph because Artis was unable to do so. Detective Perez testified that in a separate lineup Artis identified Collins's photograph with one hundred percent certainty.

Artis testified that he selected "the same two people that I'm talking about" at trial in the photographic lineups. He was unable to formally identify appellant in court when asked to do so, stating, "I don't see—he is a big dude. That's all I can tell." On redirect, the prosecutor showed Artis a photograph that the prosecutor incorrectly identified as "State's Exhibit No. 3," and Artis identified the individual in that photograph as the same person he had been referring to throughout his testimony and the recorded statement as "the big dude."

The State also introduced evidence of a jail telephone call that appellant made to his wife on August 17, 2010, at 11:40 p.m. Toward the end of the phone call, which lasted approximately ten minutes and thirty-seven seconds, appellant's wife told him that "I got your car parked." He told her to go through the car and see if there are "any type of bullets or anything" in the car, and to "get that shit" out of the car in case "they try to come get my car." Just before the call ended, appellant's wife told him that he knew they should not be discussing that over the telephone.

## DISCUSSION

### 1. Corroboration of the Accomplice Witness's Testimony

In his first issue, appellant contends the evidence is insufficient to support the conviction because the testimony of the accomplice witness, James Collins, was not corroborated. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S.

–8–

307 (1979); *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Jackson*, 443 U.S. at 326; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).

A challenge to the sufficiency of the evidence corroborating accomplice testimony is not the same as a challenge to the sufficiency of the evidence supporting the verdict as a whole. *Simons v. State*, No. 05–12–01539–CR, 2014 WL 3700667, at *6 (Tex. App.—Dallas July 24, 2014, pet. ref'd) (not designated for publication) (citing *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999); *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.)). To corroborate accomplice witness testimony, "[a]ll the law requires is that there be some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 178–79 (Tex. Crim. App. 1997)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (conviction cannot stand upon accomplice testimony unless corroborated by other evidence that tends to connect defendant with offense). Thus, corroboration is insufficient if it merely shows the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). To determine the sufficiency of the corroboration, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). An accomplice is one who participated in the offense before, during, or after its commission with the requisite mental state. *Smith*, 332

S.W.3d at 439.

The corroborating evidence may be direct or circumstantial, and need not be sufficient by itself to establish the defendant's guilt. *Id.* at 442; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999) (quoting *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)). Evidence that the defendant was in the company of the accomplice at or near the time or place of the crime is proper corroborating evidence, but such evidence alone is not conclusive corroboration. *Hernandez*, 939 S.W.2d at 178; *Nolley v. State*, 5 S.W.3d 850, 854 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. No precise rule can be formulated as to the amount of evidence that is required to corroborate the testimony of an accomplice. *Dowthitt*, 931 S.W.2d at 249. But there is sufficient corroboration if the combined force of all the non-accomplice evidence shows that rational jurors could have found that it sufficiently tended to connect the defendant to the offense. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. Hence, "when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to the view of the evidence chosen by the fact-finder." *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *see also Smith*, 332 S.W.3d at 442.

Appellant's brief uses a side-by-side comparison to illustrate various inconsistencies between Artis's and Collins's testimony, arguing that Artis's testimony fully incriminated

–10–

Collins but did nothing more than show appellant was present at Collins's apartment and in Artis's car. Appellant further argues there is no corroboration of Collins's testimony that it was appellant who took Artis's money and gun, fired the shot that injured Artis, or that appellant started the fire in Artis's car. As a result, according to appellant, Artis's testimony did not corroborate Collins's testimony.

There is no question that Artis's testimony differed from Collins's version of the offense. But such conflicts are matters inherently related to the weight and credibility of the evidence, and the jury as factfinder resolved those conflicts in the witnesses' testimony in the State's favor. It is not appropriate for us to independently construe or weigh the non-accomplice evidence. *See Smith*, 332 S.W.3d at 442. The jury could have concluded the inconsistencies between Artis's and Collins's testimony were hardly surprising given the medical trauma Artis suffered, including head injury, severe burns, smoke inhalation, and coma. "The issue then is not how an appellate court would independently assess the non-accomplice evidence but whether a rational fact-finder could conclude that the non-accomplice evidence 'tends to connect' appellant to the offense." *Simmons*, 282 S.W.3d at 509. The non-accomplice evidence does not have to directly link an appellant to the crime or, standing alone, establish his guilt beyond a reasonable doubt; it must tend to connect him to the offense. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997).

In this case, the testimony provided by Artis, combined with other evidence, tended to connect appellant to the offense. Artis's testimony indicated that appellant, who he identified as "the big dude," was in the apartment when Artis was hit on the back of the head, robbed of his marijuana, his car keys, and that appellant was in the car when Artis was confined in the trunk. During the interview with Detective Perez, Artis told the detective that "the big dude" put him in the trunk. When Detective Perez asked Artis if he remembered who shot him, he said, "The big

–11–

dude." Detective Perez then reviewed this information with Artis again, and Artis indicated that "the big dude" put him in the trunk of the car and shot him. Other evidence showed that appellant called Collins twice shortly before the alarm was sent to the Dallas Fire Department at 4:28 p.m., and that the cell phone tower that handled those calls was approximately 7/10 of a mile from the location of the burning car. Viewing all the non-accomplice evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found that the non-accomplice evidence tended to connect appellant to the offense. Accordingly, the evidence is sufficient to support appellant's conviction for aggravated robbery. We overrule appellant's first issue.

## 2. Admission of Testimony Regarding Appellant's Cell Phone Records

In his second issue, appellant contends that the trial court erred by refusing to conduct a hearing before admitting expert testimony under rule 702 concerning the interpretation of appellant's cellular telephone records.

Prior to trial, the State and the defense had agreed to the admission of appellant's cellular telephone records, State's exhibit 141, through an authenticating business records affidavit. Subsequently, however, the defense asked for a *Daubert*[4] hearing, arguing that the court should hold such a hearing before any witness testified regarding the contents of the phone records. The State assured the trial court that it did not intend to call any experts in the field of cellular phone records, and that the defense was not entitled to a hearing on the issue of whether a witness could testify regarding the contents of the phone records because if the records "are in evidence, they are in evidence." The trial court denied the defense's request, agreeing with the State that if "it is going to be a business record and they are going to authenticate properly that way," then "if it's in, it's in."

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The defense counsel raised the issue of a *Daubert* hearing again shortly before the State delivered its opening statement:

> [DEFENSE COUNSEL]: And, Judge, to go back to whatever witness they are going to call that's going to testify about the cell phone records. We just request if they are they are going to testify as to anything above and beyond what's actually in the records. Otherwise, any kind of interpretation, you know, they are saying, okay, this tower covers this area or triangulation or—do you see what I'm saying, Judge? Anything other than the tower location, the times of the calls, you know, anything other than that, that's what we're objecting to, the substance of the records.
>
> THE COURT: Are you introducing the records through the business and then are you going to have the police explain what's going on or the fireman or who is going to explain it?
>
> [PROSECUTOR:] Judge, here's the deal, and I have done this for years and years. There are maps which graphically depict the information that is contained in those records. It comes straight out of the records. It is no new information. It is nothing different. It, simply, just graphically explains what is already in evidence through the records which the Defense isn't going to object to.

The trial court elected to take this issue up again later in the trial.

Additional discussion of a *Daubert* hearing occurred on the following day, prior to the start of testimony and before Detective Franco was recalled to testify regarding the cell phone records. During this discussion, the prosecutor told the trial court that "Detective Franco has created a map, himself, which is based solely on the reports. It is not any particularized or specialized knowledge. It doesn't require any training. Anybody could look at the records and say the same thing. It is, basically, graphical representation of what is already in evidence." The trial court stated, "And I'm sure he has done that a whole bunch of times." The prosecutor replied, "Probably a thousand times. That's what he does every single day on his job." The trial court also stated that the witness "would probably be considered as an expert on that because he has done it and testified to it a million times." Defense counsel asked whether the court was saying the witness qualified as an expert for cell phone forensics, to which the trial court replied, "No, I don't want to even say that. He is interpreting needs and testifying on them, and that is

–13–

that."

The prosecutor told the court that the witness would not be interpreting records but merely "looking at a piece of information and putting it on another piece of paper." The other prosecutor stated that he would introduce a disk with the cell phone records, which contained not only the cell phone calls but also the cell tower locations and other information. The first prosecutor said this was not the type of testimony that required any expertise. Defense counsel, however, argued that "this map is totally different" and that the State was going to have the witness "testify as to what the radius is of the tower." The prosecutor responded that there was nothing on the map that was not in the records. The trial court denied the defense's request for a *Daubert* hearing. At that point, defense counsel repeated his objection: "Judge, the only issue we're objecting to the officer, or detective, or whoever is going to testify about the cell phone records, testifying in what we—we believe, is an expert capacity involving the radius of the cell phone towers and we believe that requires expert knowledge." The prosecutor continued to argue there was nothing the witness would testify to that was not contained in the records.

Later in the trial, just before the State recalled Detective Franco, the parties and the trial court again discussed this issue out of the jury's presence. Defense counsel argued that "if the officer is going to testify about these cell phone towers, he is going to testify from the substance of the records." The prosecutor replied, "That is in the substance of the records." The trial court said "[t]hat's what he gleans from the records and that's how he is going to help explain that to the jury," and noted the defense's objection. Defense counsel then stated:

> Judge, I just want to tell you that because [the prosecutor] was pointing out in James Collins records that there was something that he could testify from as far as the radius of the tower, but I'm not seeing anything in Antonio Patterson's MetroPCS records other than what it shows as far as the tower location address, that he can glean any information about the radius from those records, Judge.

The prosecutor stated "[i]t's included in there." The trial court ultimately admitted appellant's

MetroPCS phone records, State's exhibit 141, over defense counsel's renewed objection. Collins's cell phone records, State's exhibit 136, were admitted without objection from the defense, as were the six Google Earth maps created by Detective Franco, State's exhibits 147 to 152, that he used during his testimony.

Rule of Evidence 702 governs the admission of expert scientific evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702.[5] Before admitting expert scientific testimony, the trial court must determine whether the testimony is sufficiently reliable and relevant to help the jury reach accurate results and whether the expert witness is competent to testify as an expert on the subject for which his testimony is proffered. *See id.*; *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992); *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999) (noting that "gatekeeping" role assigned to trial courts under *Daubert* applies same reliability standard to all scientific, technical, or other specialized matters within scope of rule 702).

As a general rule, there are three separate conditions for the admissibility of expert testimony: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *see also* TEX. R. EVID. 401, 402, 702. These conditions are often referred to as qualification, reliability, and relevance. *Vela v. State*, 209 S.W.3d 128, 130–31 (Tex. Crim. App. 2006). Before admitting expert

---

[5] Effective April 1, 2015, the Texas Supreme Court adopted amendments to the Texas Rules of Evidence. *See* 78 TEX. B.J. 42, 42 (Tex. 2015). The amendments were part of a restyling project and changed the wording, although not the substance, of the rules cited in this opinion. All citations to the rules of evidence in this opinion refer to the rules as they existed during the parties' trial.

testimony, a trial court must determine that all three conditions are met. *Id.* While there is no strict formula for determining when an expert is qualified to testify, three criteria are generally considered: (1) the complexity of the field of expertise; (2) whether the expert's opinion is conclusive; and (3) whether the area of expertise is central to the resolution of the lawsuit. *Vela*, 209 S.W.3d at 131 (quoting *Rodgers*, 205 S.W.3d at 528). Because a witness will not always qualify as an expert by virtue of general background, the proponent of the expert must show the expert has sufficient knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Id.* at 132.

Appellant argues that the trial court abused its discretion by allowing Detective Franco to provide expert testimony without first holding a *Daubert* hearing because there was no evidence regarding what knowledge, training, education, experience, or expertise he had regarding cell phone records, cell phone towers, or the interpretation of such data.[6] There was testimony that he worked as a Dallas Police Officer for over twelve years and for six of those years was employed by the "Fusion Unit," which the detective described as a "24-hours a day, seven days a week" unit that assisted with all major cases and did a lot of work with other law enforcement agencies such as the DEA, the U.S. Marshals, and surrounding agencies. He had specific training in the area of photographic lineups. But appellant maintains that nothing about Detective Franco's training or experience specifically qualified him as an expert in cell phones or cell phone technology, nor as an expert in locating cell phones based on cell tower location and radius.

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). Thus, we will uphold the

---

[6] For purposes of discussion, we will assume, without deciding, that Detective Franco testified as an expert.

–16–

trial court's ruling on the admissibility of an expert witness as long as it falls "within the zone of reasonable disagreement." *Id.*; *see also Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) ("The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion."). Likewise, we review the trial court's ruling on the relevancy and probative value of evidence for abuse of discretion. *See Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

Appellant unfavorably compares Detective Franco's qualifications with those of similar experts in *Wilson v. State*, 195 S.W.3d 193, 200–01 (Tex. App.—San Antonio 2006, no pet.), and *Robinson v. State*, 368 S.W.3d 588, 600–01 (Tex. App.—Austin 2012, pet. ref'd). In *Wilson*, the court of appeals found that the trial court did not abuse its discretion by admitting expert testimony from a Sprint employee whose duties included accessing customer records in order to provide tower locations. 195 S.W.3d. at 201. The Sprint employee had a Bachelor's degree in criminal justice and had testified in court multiple times regarding the tracking of cell phone calls. *Id.* In *Robinson*, a sheriff's deputy testified that he had completed three years of college course work in criminal justice; his intelligence unit used "cell phones, MySpace pages, and any kind of computers" or technology to track the location of fugitives or persons under investigation; and he had completed a three-day training course in reading cell phone records, identifying cell phone tower locations, and plotting and tracking cell phone activity. 368 S.W.3d at 600–01.

But in reviewing the trial court's ruling, we must first consider whether the field of expertise on which Detective Franco's testimony was based is complex. *See Rodgers*, 205 S.W.3d at 527–28. As the *Rodgers* court stated:

> The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify. If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the

–17–

evidence is well outside the jury's own experience.

*Id.* at 528 (footnote omitted). Detective Franco testified at trial that he typed in the addresses of specific cell phone tower locations and then printed maps from Google Earth that showed those tower locations. The process, as described by the detective, is forthright and easily understood by a jury. Appellant's MetroPCS phone records have categories for the phone number of the outgoing call, the phone number of the answered call, the duration of the call, and the cell tower that received and transmitted the call—the same information on which Detective Franco's testimony was based. Moreover, the six Google Earth maps depicting the cell tower locations were admitted without objection from the defense, as were Collins's cell phone records. Because an analysis such as the one performed by Detective Franco was relatively simple, the required degree of education, training and experience was not extremely high. *See id.* The trial court could have concluded that the detective's qualifications, including his training and law enforcement experience as well as his experience with the "Fusion Unit," were sufficient such that his testimony would "assist the trier of fact to understand the evidence." *See* TEX. R. EVID. 702.

Regarding the second and third prongs, Detective Franco's testimony was neither conclusive nor dispositive. *See Vela*, 209 S.W.3d at 131. Detective Franco's testimony showed that on the day of the offense appellant made two phone calls to Collins between 4:03 and 4:17 p.m., shortly before the 4:28 p.m. alarm to the Dallas Fire Department, and that these calls were "hitting" off of a cell phone tower that was approximately 7/10 of a mile from the location of the burning car. Such evidence tended to connect appellant to the crime *scene*, but it did not, by itself, conclusively connect appellant to the *offense*. As previously discussed, the jury heard other evidence that, when combined with other evidence in this case, tended to connect appellant to the offense. After reviewing the relevant criteria, we cannot say the trial court abused its

–18–

discretion by admitting Detective Franco's testimony. *See Sexton*, 93 S.W.3d at 99. Having so found, we need not address whether appellant's substantial rights were affected by the trial court's ruling. *See* TEX. R. APP. P. 44.2(b). We overrule appellant's second issue.

We affirm the trial court's judgment.

/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
130450F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ANTONIO PATTERSON, Appellant

No. 05-13-00450-CR  V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4, Dallas County, Texas
Trial Court Cause No. F10-59304-K.
Opinion delivered by Justice Myers. Justices Evans and O'Neill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of May, 2015.

18-0883

Antonio Patterson
Telford Unit
3899 State Hwy 98
New Boston, Tx 75570

LEGAL MAIL

To: Clerk of The Court of Criminal
Appeals
Supreme Court Building
P.O. Box 12308
Austin, Texas 78711



78711230808